UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SENIOR HOME HEALTH CARE, INC.,

    Plaintiff,

v.

SUNRISE MEDICAL HHG, INC., ET AL.,

    Defendants.
                                      /

Case No. 08-10064

Honorable Nancy G. Edmunds

**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT [12]**

This insurance dispute comes before the Court on Plaintiff Senior Home Health Care, Inc. ("Senior Home")'s motion for summary judgment and Defendants Sunrise Medical HHG, Inc. ("Sunrise Medical") and Noetic Specialty Insurance Company ("Specialty Insurance")'s cross-motion for summary judgment. For the reasons stated below, Plaintiff's motion is GRANTED IN PART, and Defendants' cross-motion is DENIED.

**I.    Facts**

This insurance dispute arises out of a fire to an apartment building located at 24211 Denise, Clinton Township, Michigan. On November 25, 2005, at around 10:50 p.m., the resident of apartment 73B, Paul Renwick, accidentally set fire to the apartment building. Mr. Renwick gave several different explanations of the fire's origins. During Mr. Renwick's questioning at the scene of the fire by Officer Gilchrist of the Clinton Township Police Department, he stated that the fire started when he "lit a cigarette in front of one of the six oxygen tanks" located in his apartment "and it exploded." (Pl.'s Ex. B, 11/25/05 General

Incident Report.)  After being transported to the hospital, Mr. Renwick was interviewed by fire investigators Conroy and Kuehn.  Mr. Renwick told them that "he had stopped smoking a couple of weeks ago but he sat up on the couch, w[h]ere he was sleeping, to light a cigarette.  He did this from habit, there was no cigarette.  <u>He was breathing from a nasal cannula at the time</u>, he said flames shot up and burned his face."  (Pl.'s Ex. C, Incident No. 6822, Conroy Report at 1 (emphasis added).)  Finally, a third scenario of the fire involves "a cigarette smoldering in a couch in the apartment of Paul Renwick" that "became free burning and ignited other flammable materials in the apartment."  (Defs.' Ex. 2, Willis Aff. at ¶ 4.)  The last scenario is described more fully below.

Sergeant David Willis of the Macomb County Sheriff's Department helped investigate the fire on November 29 and 30, 2005 and prepared a written report.  Relevant portions of that report are as follows.  Willis "was informed that Mr. Remwick [sic] is a smoker and that there was oxygen in use in the apartment at the time . . . [and] Mr. Remwick [sic] was sleeping on the couch when the fire started."  (Defs.' Ex. 2, 2/1/06 Investigative Suppl. Report at 1.)  He was also informed that "Mr. Remwick [sic] received his oxygen through Senior Health Care out of Walled Lake."  (*Id.* at 2.)  He "contacted the company and spoke with Ilene Simms about the possible hazards in Mr. Remwick's [sic] apartment" and "Ilene stated that when they last visited Mr. Remwick [sic] on 3-30-05 he was in possession of (3) three A tank w/ a 170-liter capacity, (1) E tank w/ a 420-liter capacity and (1) one oxygen concentrator machine."  (*Id.*)

During a search of what remained of Mr. Renwick's heavily damaged apartment, the following was located:  (1) "what was believed to be the remains of the oxygen generator;" (2) "two of the (3) three A tank w/ a 170-liter capacity.  One was located in the area of the

Oxygen generator and one between the couch and coffee table. The O2 bottle between the couch and coffee table was heavily damaged;" (3) "[t]he area of the coffee table was excavated and located was the tables [sic] broken glass, a silver bowl and charred fire debris. Located inside the bowl was a zippo lighter;" (4) "located in the south corner was the third A tank w/ a 170-liter capacity;" (5) "[t]he oxygen generator was observed to not be plugged in at the time of the fire;" and (6) "[l]ocated in the master bedroom was a trashcan, which contained several empty cigarette packs and cigarettes [sic] buds." (*Id.* at 4-7.) In compliance with a search warrant, Sergeant Willis removed the following evidence: "the 02 generator, three 02 tanks, 1 burnt bowl w/contents and one cigarette carton." (*Id.* at 7.)

Sergeant Willis then reported the origin of the fire as "the couch area" and the cause of the fire as "accidental, due to careless smoking." (*Id.* at 8.) Specifically, he reported that:

> The origin of the fire will be located in Apartment 73B located at 24211 Denise. The area of origin will be the south wall located near the window, more specifically the couch area.
>
> The incident reports from Clinton Twp. Police Dept. were reviewed and indicated that Mr. Remwick [sic] had been known to smoke while on 02. Mr. Remwick [sic] had been warned and observed to smoke while wearing his 02. Mr. Remwick [sic] also had signed a document warning against this behavior. Witnesses also stated that they were in his apartment a few weeks before the fire cleaning the carpets and indicated that there were dozens of burn holes in the carpet and on the couch [sic] evidence of prior careless smoking. Evidence of the smoking materials were located in a plastic garbage can in the apartment.
>
> No evidence was located to show the fire was incendiary (arson), the gas and electrical were ruled out as a fire causes [sic]. The oxygen generator was not found plugged in and the bottles of 02 besides exploding under fire attack would have then expelled 02, which would have accelerated the fire.
>
> The cause of the fire will be **accidental**, due to careless smoking.

3

(*Id.* at 8 (emphasis in original).) Based on this investigation, "it was determined that the fire started from a cigarette smoldering in a couch in the apartment of Paul Renwick, Apartment 73B, which became free burning and ignited other flammable materials in the apartment." (Defs.' Ex. 2, Willis Aff. at ¶ 4.) In other words, the fire originated from careless smoking but was accelerated by other flammable materials in the apartment; i.e., oxygen.

In sum, each of the three scenarios of the fire involve the fire either originating with the oxygen equipment and/or the fire being accelerated by the presence of the oxygen equipment in the apartment. Several individuals besides Mr. Renwick were injured in the fire, and one child died. These individuals ultimately filed suit against Senior Home.

### A. Underlying Lawsuit

On April 5, 2007, a complaint was filed in Macomb County Circuit Court by the following who claim they were injured as a result of the fire: (1) Tarien Hatcher and Markquita Frederick, as co-personal representatives of the estate of their deceased minor daughter, Kimora N. Hatcher; (2) Tarien Hatcher and Markquita Frederick also sued on their own behalf; (3) Tarien Hatcher sued on behalf of Latariea, his minor daughter and Kimora's sister; (4) Yvette Hatcher, Kimora's grandmother; (5) Isabel Kuhlman; and (6) Joseph Earle ("underlying plaintiffs"). Senior Home is the sole defendant in the underlying lawsuit which alleges that each underlying plaintiff was a tenant, resident, or invitee of the apartment building located at 24211 Denise, Clinton Township, Michigan, and that Senior Home supplied oxygen equipment to a resident of that apartment building, Paul Renwick. Underlying plaintiffs further allege that, as a result of a fire on November 25, 2005, "several tenants of the apartment complex and their invitees were needlessly trapped in the building,

causing death, destruction, permanent injury and gross disfiguration, all due to" Senior Home's "negligence and breaches of duty." (Pl.'s Ex. A, State Court Compl. ¶¶ 1-12, 14.)

Specifically, the underlying complaint alleges that Senior Home (1) owed a duty to the underlying plaintiffs "to protect individuals residing in the same building as Paul Renwick, Jr. from dangerous conditions or hazards posed by smoking near oxygen tanks and equipment;" (2) breached that duty by failing (a) to perform and/or repeat a safety risk assessment of the premises, (b) to provide and/or reinforce education to Paul Renwick regarding causes of fire and fire prevention, (c) to assess and/or reassess Paul Renwick's level of comprehension and compliance, (d) to report Paul Renwick's noncompliance with safety rules to his physician, (e) to warn the other occupants of Renwick's apartment building of the foreseeable harm caused by his smoking while using oxygen, (f) to notify the fire department and/or law enforcement officials that Paul Renwick was smoking cigarettes while at the same time dispensing oxygen from his oxygen tank despite knowledge of same, (g) to notify apartment complex personnel or management that Paul Renwick was smoking cigarettes while at the same time dispensing oxygen from his oxygen tank despite knowledge of same, (h) to warn people in other apartments that Paul Renwick was smoking cigarettes while at the same time dispensing oxygen from his oxygen tank despite knowledge of same, and (i) other breaches of the duty of care that become apparent during discovery; and (3) each breach was a proximate cause of the underlying plaintiffs' injuries. (*Id.*) In sum, it is alleged that Senior Home breached a duty owed to the underlying plaintiffs by failing to perform and repeat certain acts while supplying Mr. Renwick with oxygen equipment and by failing to warn various people about his habit of smoking while

using the oxygen equipment and thus caused their injuries in the November 25, 2005 apartment fire.

## B. Oxygen Equipment

Senior Home had an oxygen service contract with Mr. Renwick, agreeing to deliver and service an oxygen concentrator and oxygen tanks for his use. Senior Home, in turn, had an agreement to purchase oxygen equipment from Defendant Sunrise Medical from March 27, 2004 through March 31, 2006. (Pl.'s Ex. D, Senior Home/Sunrise Medical Contract.) Senior Home purchased oxygen concentrators, oxygen regulators, and oxygen aerosol canisters from Defendant Sunrise Medical. (Pl.'s Exs. E, G, I, J, K.)

The oxygen tanks supplied to Mr. Renwick by Senior Home had conservers, manufactured by Sunrise Medical, which were designed to control the flow of oxygen. At least one conserver serial number involved in the Renwick fire was recorded. On July 7, 2004, Sunrise Medical shipped an oxygen pulse conserver to Senior Home with the serial number 04F1D129651. (Pl.'s Ex. G.) On July 20, 2004, a Senior Home employee made a service call to Mr. Renwick and recorded delivering a new conserver with that same serial number. (*Id.*)

Mr. Renwick's apartment also contained an oxygen concentrator manufactured by Sunrise Medical and delivered by Senior Home. "An oxygen concentrator is a separate device electrically operated that, when plugged into an electrical outlet, separates oxygen from room air which allows supplemental oxygen to be delivered to the patient's nasal cannula tubing." (Olsavsky Aff. ¶ 5.) "It does not store oxygen, and when turned off or unplugged does not retain residual oxygen." (*Id.*) On January 12, 2004, Sunrise Medical delivered a DeVilbiss brand oxygen concentrator, serial number H62779DS to Senior

Home. (Pl.'s Ex. I.) That same oxygen concentrator was delivered to Mr. Renwick on June 29, 2004. (Pl.'s Ex. J.) On December 2, 2004 and March 30, 2005, a Senior Home employee serviced an oxygen concentrator at Mr. Renwick's apartment with that same serial number. (Pl.'s Ex. K.) The fire investigator's recovered "1 burnt oxygen concentrator" from Mr. Renwick's apartment after the fire.

Although the fire investigator's report states that the oxygen concentrator was not plugged in at the time of the investigation, Mr. Renwick told fire investigators Conroy and Kuehn, immediately after being transported to the hospital, that he was breathing from his nasal cannula at the same time he was trying to light a cigarette when flames shot up, burned his face, and then caught the rug on fire. He also told Conroy and Kuehn that, after he ran out of his apartment, fire shot across the hall and burned his back. (*Compare* Pl.'s Ex. C, Conroy Report, *with* Defs.'s Ex. 2, 2/1/06 Investigative Suppl. Report.)

### C. Noetic Insurance Policy

Sunrise Medical had a "claims made" commercial general liability ("CGL") policy, No. N06CA380050, with Defendant Noetic Specialty Insurance with a policy period covering July 1, 2006 to July 1, 2007. (Pl.'s Ex. L, insurance policy.) The policy contained an endorsement, No. CG 20 15 11 88, adding "all vendors" of all of Sunrise Medical's products as named insureds under the policy. The endorsement reads as follows:

> WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as vendor) shown in the Schedule, but only <u>with respect to "bodily injury"</u> or "property damage" <u>arising out of "your products"</u> shown in the Schedule which are distributed or sold in the regular course of the vendor's business. . . .

(*Id.* at Endorsement No. CG 20 15 11 88 (emphasis added).)[1]  It is not disputed that Plaintiff Senior Home was a vendor of Sunrise Medical and thus included under the Noetic Special Insurance policy as an additional insured under certain circumstances.

The CGL insurance policy's insuring agreement provides a duty to defend and indemnify "bodily injury" caused by an "occurrence" that takes place in the "coverage territory" and a claim for damages because of the "bodily injury" is "first made against the insured, . . . , during the policy period or any Extended Discovery Period we provide under EXTENDED DISCOVERY PERIODS (Section V)." (*Id.* at CGL Policy, Products/Completed Operations Liability (Claims-Made) Form No. CG 38 A 06 96 at p. 1.)  Specifically, the policy provides that:

1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" included within the "products-completed operations hazard" to which this insurance applies. <u>We will have the right and duty to defend the insured</u> against any "suit" seeking those damages. <u>However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply</u>. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

(*Id.* (emphasis added).)

The following definitions are relevant to this insurance dispute:

2. "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * * * *

---

[1] The endorsement also sets out a number of exclusions that are not relevant here. (Pl.'s Ex. L, insurance policy, Endorsement No. CG 20 15 11 88.)

13. "Products-completed operations hazard":

    a. Includes all "bodily injury" . . . occurring away from premises you own or rent and <u>arising out of</u> "your product" or "your work" . . . .

17. "Your product" means:

    a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        (1) You;

        (2) Others trading under your name; or

        (3) A person or organization whose business or assets you have acquired; and

    b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

    a. Warranties or representations made at any time with respect to fitness, quality, durability, performance or use of "your product"; and

    b. <u>The providing of or failure to provide warnings or instructions</u>.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

(*Id.* at 8, 10, 11 (emphasis added).)

### D. Notice of Claim, Denial of Defense, and Filing of This Action

The underlying lawsuit was filed on April 5, 2007. Based on the vendor's endorsement, Senior Home tendered the underlying lawsuit to Sunrise Medical and requested both defense and indemnity on May 2, 2007. (Pl.'s Ex. M, 5/2/07 letter.) Sunrise Medical and Noetic Specialty Insurance denied Senior Home's requests. Senior Home then filed this action seeking a judgment declaring that it is an additional insured under

Sunrise Medical's CGL policy with Noetic and is thus owed a defense and indemnification for the claims asserted in the underlying lawsuit.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

This matter is now before the Court on Plaintiff Senior Home's motion for summary judgment, arguing that it is entitled to a judgment declaring that Sunrise Medical, through its insurer Noetic Specialty Insurance, owes it a duty to defend and indemnify it in connection with the underlying lawsuit. Because Defendants breached their duty to defend, Plaintiff seeks reimbursement of all attorney fees and costs incurred in connection with its defense in the underlying lawsuit and an order requiring Defendants to pay for all future reasonable costs and attorney fees incurred through the continued retention of Plaintiff's current counsel Thomas Peters and the law firm of Vandeveer Garzia P.C.

Also pending before the Court is Defendants' cross-motion for summary judgment. Defendants argue that there is no duty to defend or indemnify because the Additional Insured - Vendor's Endorsement "is intended to cover a vendor's liability arising out of the vendor's role in passing the product on to customers and is not intended to cover vendors for their own negligent conduct. . . . The intent is to limit coverage in relation to injuries arising out of product defects." (Defs.' Resp. at 13.) Defendants further argue that, because "[t]he underlying injuries to the [underlying] plaintiffs arose from smoke and fire," which are not products of Sunrise Medical," Plaintiff "does not qualify as additional insured under the Noetic Policy" and thus is not entitled to a defense or indemnification in the underlying lawsuit.

Because the duty to defend is broader than the duty to indemnify, the core dispute this Court must resolve concerns whether Noetic Specialty Insurance has a duty to defend Senior Home in the underlying lawsuit. The Court begins its analysis with general principles of Michigan law and then applies them by examining the plain language of

11

Sunrise Medical's insurance policy with Noetic Specialty Insurance and the allegations of the underlying lawsuit.

### A. Duty to Defend

#### 1. General Principles

Under Michigan law, it is well-established that the insurance company's "duty to defend and [its] duty to provide coverage are not synonymous." *Illinois Employers Ins. of Wausau v. Dragovich*, 362 N.W.2d 767, 769 (Mich. Ct. App. 1984). "The duty to defend is broader than the duty to pay." *Pattison v. Employers Reinsurance Corp.*, 900 F.2d 986, 989 (6th Cir. 1990). It extends to allegations which are groundless, false, or fraudulent; it extends to allegations that even arguably come within the policy coverage. *Id.* at 989-90. *Accord Capitol Reproduction, Inc. v. Hartford Ins. Co.*, 800 F.2d 617, 620 (6th Cir. 1986). Michigan law further recognizes that when an insurer fails to fulfill its duty to defend, "it becomes liable for all foreseeable damages flowing from the breach," including amounts paid in settlement. *Capitol Reproduction*, 800 F.2d at 624. An insurer's duty to defend is determined by examining the allegations of the underlying complaint against the insured. *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 301 N.W.2d 832, 835 (Mich. Ct. App. 1980). The duty, however, is not limited by the precise language of the complaint; the insurer is required to look behind the allegations "to analyze whether coverage is possible. In a case of doubt . . . , the doubt must be resolved in the insured's favor." *Capitol Reproduction*, 800 F.2d at 620 (quoting *Western Cas. & Sur. Group v. Coloma Twp.*, 364 N.W.2d 367, 369 (Mich. Ct. App. 1985)). "An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy." *Detroit Edison*, 301 N.W.2d at 835

(emphasis added). "Once triggered, the duty to defend continues until that stage in the proceedings is reached where there is no longer any uncertainty as to the possibility of coverage." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 44 F. Supp.2d 847, 853 (E.D. Mich. 1997) (citing *Am. Bumper & Mfr. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 483 (Mich. 1996)).

Applying the above principles here, this Court concludes that Defendant Noetic Specialty Insurance owes Senior Home a duty to defend in the underlying state court action.

### 2. Coverage Under Noetic Specialty Insurance's Policy

Defendants argue that there is no duty to defend here because Senior Home is not an additional insured vendor as defined under the "Additional Insured - Vendor" Endorsement to Sunrise Medical's CGL policy. Specifically, it is argued that (1) this Endorsement covers vendors "only with respect to 'bodily injury" that "arises out of" a defect in Sunrise Medical's products, and there is no evidence that the fire burns and smoke inhalation bodily injuries at issue in the underlying litigation were caused by a malfunction of one of Sunrise Medical's products. Defendants' arguments are rejected because they misconstrue the plain language of Sunrise Medical's policy and its endorsements.

First, there is no language in the Endorsement that limits vendor coverage to "bodily injury" that arises solely from a defect in a Sunrise Medical product. General principles of contract interpretation do not allow the Court to alter the express language of the parties' insurance contract. If an insurance contract is clear and unambiguous, the Court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins.*

13

*Co.*, 505 N.W.2d 553, 557 (Mich. 1993), without looking to extrinsic evidence. It is improper for the Court to ignore the plain meaning of the policy's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989). Moreover, it is the insurer's responsibility to clearly express limits on coverage. *Auto Club Ins. Ass'n v. DeLaGarza*, 444 N.W.2d 803, 806 (Mich. 1989). Thus, if the Endorsement was meant to express limits on coverage in the manner Defendants suggest, it was Defendant insurer's responsibility to do so in that Endorsement. It did not, and this Court will not add a limit on coverage that its not clearly expressed.

Rather, the plain language of the "Additional - Insured - Vendor" Endorsement includes Sunrise Medical vendors as insureds for "'bodily injury' arising out of 'your products' . . . which are distributed or sold in the regular course of the vendor's business." (Pl.'s Ex. L, Endorsement No. CG 20 15 11 88.) "Your product" is expressly defined to include "[t]he providing of or failure to provide warnings or instructions." (*Id.* at CGL Policy, Form CG 38 A 06 96 at ¶ 17.b.) The underlying lawsuit alleges injuries satisfying the policy definition for "bodily injuries" caused by Senior Home's failure to provide adequate warnings and/or instructions in connection with Sunrise Home's oxygen equipment that was distributed to Mr. Renwick for use in his apartment. Because, the underlying lawsuit alleges "bodily injury" arising out of activity defined under the Noetic Specialty policy as "Your product," the duty to defend is triggered. "The duty to defend is broader than the duty to pay." *Pattison*, 900 F.2d at 989. It extends to allegations which are groundless, false, or fraudulent; it extends to allegations that even arguably come within the policy coverage. *Id.* at 989-90.

Second, the Noetic Specialty policy also defines "Your product" as "[a]ny goods or products, manufactured, sold, handled, distributed or disposed of by . . . You. . . ." (Pl.'s Ex. L, Policy at ¶ 17.a(a).)  Despite Defendants' claims otherwise, there is evidence that Mr. Renwick attempted to light a cigarette while he was breathing from a nasal cannula or tubing and inhaling oxygen with assistance from oxygen equipment distributed by Sunrise Medical when the fire started.  Moreover, if in use, this Sunrise Medical equipment may have caused the fire to accelerate.  (Pl.'s Ex. C, Conroy Report at 1; Defs.' Ex. 2, 2/1/06 Investigative Suppl. Report at 1.)  Thus, there is evidence in the underlying lawsuit of "bodily injury" arising out of a product distributed by Sunrise Medical.  An insurer's duty to defend is determined by examining the allegations of the underlying complaint against the insured.  *Detroit Edison*, 301 N.W.2d at 835.  The duty, however, is not limited by the precise language of the complaint; the insurer is required to look behind the allegations "to analyze whether coverage is possible.  In a case of doubt . . . , the doubt must be resolved in the insured's favor."  *Capitol Reproduction*, 800 F.2d at 620 (quoting *Western Cas. & Sur. Group v. Coloma Twp.*, 364 N.W.2d at 369).  "An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy."  *Detroit Edison*, 301 N.W.2d at 835 (emphasis added).

Finally, the duty to defend is triggered under the definition of "arising out of" that Defendants provide; i.e., "[t]he insured must show more than minimal 'but for' causation." *Pacific Employers Ins. Co. v. Mich. Mut. Ins. Co.*, 549 N.W.2d 872, 875 (Mich. 1996).  In *Pacific Employers*, the Michigan Supreme Court construed language in a school district's automobile insurance policy to determine whether coverage was provided in circumstances

where an elementary school student was injured after being disembarked from a school bus at the wrong bus stop. The policy provided coverage for bodily injury "caused by accident *arising out of the ownership, maintenance or use, including loading or unloading*, of the owned motor vehicle . . . ." *Id.* at 874 (emphasis added in decision) (internal quotations and citation omitted). Considering whether the child's injury "'arose from' the 'use' of the school bus," the Court determined that "there . . . must be a causal connection between the injury sustained and the ownership, maintenance or use of the automobile and which causal connection is more than incidental, fortuitous or but for. The injury must be foreseeably identifiable with the normal use, maintenance and ownership of the vehicle." *Id.* at 875 (internal quotations and citation omitted). The Court then held that "[w]hen this [school bus] driver failed to disembark the child at the correct location, she 'misused' the bus. The injuries that followed were foreseeably identifiable with the negligent decision to disembark the child at the wrong stop." *Id.* at 876. The Court rejected the automobile insurer's argument that "it is not subject to liability because it was the school bus driver's 'separate, personal act of discharging [the child] at the wrong stop' and not her 'use' of the school bus that caused the injuries." *Id.* at 877. It held that "[t]his is not a legally recognizable distinction. . . . The school bus driver's charge included disembarking the children at predetermined bus stops, not merely transporting them to and from school. The driver 'used' the school bus in doing so, even if one characterizes her conduct as a 'separate and personal' act." *Id.* It further explained that:

> [a] foreseeably identifiable injury resulting from the failure to disembark a child
> from the school bus at the predetermined destination is no more beyond the
> scope of 'use' under the [automobile] Policy because the separate and personal
> negligence of the school bus driver was involved than a foreseeably identifiable
> injury caused by the school bus crossing a double yellow line or going through

16

> a red light would be excluded from 'use' under the [automobile] policy because the separate and personal negligence of the school bus driver was involved.

*Id.*

More recently, the Michigan Court of Appeals observed that, although "[t]he phrase 'arising out of' has been defined in different contexts," it has generally been construed to "require[] a causal connection." *Empire Fire & Marine Ins. Co. v. Minuteman Int'l, Inc.*, No. 274660, 2008 WL 142424, * 2 (Mich. Ct. App. Jan. 15, 2008) (citing cases).

Applying these principles to the facts of this case, the issue is whether the underlying lawsuit alleges "bodily injury" that has a causal connection that is "more than incidental, fortuitous or but for" with "Your products." "Your products" is expressly defined in the policy to include both (1) a product manufactured, sold, handled, or distributed by Sunrise Medical; and (2) the provision of or failure to provide warnings or instructions. Examining the allegations and evidence with regard to the underlying lawsuit, this Court concludes that coverage is possible under the Noetic Speciality policy, and thus the duty to defend is triggered. The underlying lawsuit alleges that each of the underlying plaintiff's suffered "bodily injury" as a result of Sunrise Medical's vendor's failure to provide adequate warnings or instructions in connection with a product manufactured, sold, handled or distributed by Sunrise Medical to its vendor, Senior Home.

As the Michigan Supreme Court observed, "[t]he duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor." *Am. Bumper & Mfr. Co. v.*

*Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 (Mich. 1996) (internal citations omitted). That was not done here, and thus Noetic Specialty Insurance breached its contractual duty to defend Senior Home in the underlying lawsuit. Accordingly, Plaintiff's motion for summary judgment is granted on this issue, and Defendants' cross-motion is denied. Because Plaintiff has not presented the Court with any evidence as to the amount of defense costs owed or any argument as to its right to continued retention of its current defense counsel in the underlying lawsuit, summary judgment cannot be granted on those issues.

### B. Duty to Indemnify

Similarly, because genuine issues of material fact exist on the issue of Noetic Specialty's duty to indemnify, the parties' cross-motions for summary judgment on this issue are denied.

## IV. Conclusion

For the above-stated reasons, Plaintiff's motion for summary judgment is GRANTED IN PART, and Defendants' cross-motion is DENIED.

    s/Nancy G. Edmunds  
    Nancy G. Edmunds  
    United States District Judge

Dated: August 5, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 5, 2008, by electronic and/or ordinary mail.

    s/Carol A. Hemeyer  
    Case Manager