UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SENIOR HOME HEALTH CARE, INC.,

      Plaintiff,

v.

SUNRISE MEDICAL HHG, INC., ET AL.,

      Defendants.

_____/

Case No. 08-10064

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S  MOTION FOR
SUMMARY JUDGMENT REGARDING DAMAGES [24], DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT REGARDING INDEMNIFICATION [31], AND
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT [32]**

      This insurance dispute arises out of an apartment fire that occurred on November 25,

2005 and generated an underlying state court action against the Plaintiff here.  This matter

comes before the Court on three motions:  (1) Plaintiff Senior Home Health Care, Inc.'s

motion for summary judgment regarding attorney fees and costs owed as damages for

breach of the contractual duty to defend [24]; (2) Plaintiff Senior Home's motion for

summary judgment regarding indemnification [31]; and (3) Defendants Sunrise Medical

HHG, Inc.'s and Noetic Specialty Insurance Company's cross-motion arguing that it owes

no duty to indemnify and also arguing that Defendants no longer owe Plaintiff a duty to

defend because there is no longer any uncertainty as to the possibility of coverage [32].

For the reasons stated below, (1) Plaintiff's motion regarding defense costs is GRANTED

IN PART and DENIED IN PART; (2) Plaintiff's motion for summary judgment regarding

indemnification is DENIED; and (3) Defendant's cross motion for summary judgment is DENIED.

I.   **Facts**

   A. **Background Facts of Underlying State Court Action**

   This insurance dispute arises out of a fire to an apartment building located at 24211 Denise, Clinton Township, Michigan. On November 25, 2005, at around 10:50 p.m., the resident of apartment 73B, Paul Renwick, accidentally set fire to the apartment building. Mr. Renwick gave several different explanations of the fire's origins. During Mr. Renwick's questioning at the scene of the fire by Officer Gilchrist of the Clinton Township Police Department, he stated that the fire started when he "lit a cigarette in front of one of the six oxygen tanks" located in his apartment "and it exploded." (Doc. Entry No. 31, Pl.'s Ex. C, 11/25/05 General Incident Report.) After being transported to the hospital, Mr. Renwick was interviewed by fire investigators Conroy and Kuehn. Mr. Renwick told them that "he had stopped smoking a couple of weeks ago but he sat up on the couch, w[h]ere he was sleeping, to light a cigarette. He did this from habit, there was no cigarette. <u>He was breathing from a nasal cannula at the time</u>, he said flames shot up and burned his face." (Doc. Entry No. 9, Pl.'s Ex. C, Incident No. 6822, Conroy Report at 1 (emphasis added); Doc. Entry No. 36, Pl.'s Ex. B, Conroy Testimony 9/26/06 Crim. Trial Tr. at 26.) The nasal cannula would have been connected to either the Sunrise Medical concentrator or the regulator/conserver on top of an oxygen tank. Finally, a third scenario of the fire involves "a cigarette smoldering in a couch in the apartment of Paul Renwick" that "became free burning and ignited other flammable materials in the apartment." (Doc. Entry No. 12, Defs.'

Ex. 2, Willis Aff. at ¶ 4; Doc. Entry No. 36, Pl.'s Ex. D, Willis 9/26/06 Crim. Trial Tr. at 6-8.)

The last scenario is described more fully below.

Sergeant David Willis of the Macomb County Sheriff's Department helped investigate

the fire on November 29 and 30, 2005 and prepared a written report.  Relevant portions of

that report are as follows.  Willis "was informed that Mr. Renwick [sic] is a smoker and that

there was oxygen in use in the apartment at the time . . . [and] Mr. Renwick [sic] was

sleeping on the couch when the fire started."  (Doc. Entry No. 12, Defs.' Ex. 2, 2/1/06

Investigative Suppl. Report at 1.)  He was also informed that "Mr. Renwick [sic] received

his oxygen through Senior Health Care out of Walled Lake."  (*Id.* at 2.)  He "contacted the

company and spoke with Ilene Simms about the possible hazards in Mr. Remwick's [sic]

apartment" and "Ilene stated that when they last visited Mr. Renwick [sic] on 3-30-05 he

was in possession of (3) three A tank w/ a 170-liter capacity, (1) E tank w/ a 420-liter

capacity and (1) one oxygen concentrator machine."  (*Id.*)

During a search of what remained of Mr. Renwick's heavily damaged apartment, the

following was located:  (1) "what was believed to be the remains of the oxygen generator;"

(2) "two of the (3) three A tank w/ a 170-liter capacity.  One was located in the area of the

Oxygen generator and one between the couch and coffee table.  The O2 bottle between

the couch and coffee table was heavily damaged;" (3) "[t]he area of the coffee table was

excavated and located was the tables [sic] broken glass, a silver bowl and charred fire

debris.  Located inside the bowl was a zippo lighter;" (4) "located in the south corner was

the third A tank w/ a 170-liter capacity;" (5) "[t]he oxygen generator was observed to not be

plugged in at the time of the fire;" and (6) "[l]ocated in the master bedroom was a trashcan,

which contained several empty cigarette packs and cigarettes [sic] buds."  (*Id.* at 4-7.)  In

3

compliance with a search warrant, Sergeant Willis removed the following evidence: "the

02 generator, three 02 tanks, 1 burnt bowl w/contents and one cigarette carton." (*Id.* at 7.)

Sergeant Willis then reported the origin of the fire as "the couch area" and the cause

of the fire as "accidental, due to careless smoking." (*Id.* at 8.) Specifically, he reported

that:

> The origin of the fire will be located in Apartment 73B located at 24211 Denise.
> The area of origin will be the south wall located near the window, more
> specifically the couch area.
>
> The incident reports from Clinton Twp. Police Dept. were reviewed and indicated
> that Mr. Renwick [sic] had been known to smoke while on 02. Mr. Renwick [sic]
> had been warned and observed to smoke while wearing his 02. Mr. Renwick
> [sic] also had signed a document warning against this behavior. Witnesses also
> stated that they were in his apartment a few weeks before the fire cleaning the
> carpets and indicated that there were dozens of burn holes in the carpet and on
> the couch [sic] evidence of prior careless smoking. Evidence of the smoking
> materials were located in a plastic garbage can in the apartment.
>
> No evidence was located to show the fire was incendiary (arson), the gas and
> electrical were ruled out as a fire causes [sic]. The oxygen generator was not
> found plugged in and the bottles of 02 besides exploding under fire attack would
> have then expelled 02, which would have accelerated the fire.
>
> The cause of the fire will be **accidental**, due to careless smoking.

(*Id.* at 8 (emphasis in original).) Based on this investigation, "it was determined that the fire

started from a cigarette smoldering in a couch in the apartment of Paul Renwick, Apartment

73B, which became free burning and ignited other flammable materials in the apartment."

(Doc. Entry No. 12, Defs.' Ex. 2, Willis Aff. at ¶ 4.) In other words, the fire originated from

careless smoking but was accelerated by other flammable materials in the apartment; i.e.,

oxygen.

In sum, each of the three scenarios of the fire involve the fire either originating with

the oxygen equipment and/or the fire being accelerated by the presence of the oxygen

equipment in the apartment.  Several individuals besides Mr. Renwick were injured in the fire, and one child died.  These individuals ultimately filed suit against Senior Home.

### A.  Underlying Lawsuit

On April 5, 2007, a complaint was filed in Macomb County Circuit Court by the following who claim they were injured as a result of the fire:  (1) Tarien Hatcher and Markquita Frederick, as co-personal representatives of the estate of their deceased minor daughter, Kimora N. Hatcher; (2) Tarien Hatcher and Markquita Frederick also sued on their own behalf; (3) Tarien Hatcher sued on behalf of Latariea, his minor daughter and Kimora's sister; (4) Yvette Hatcher, Kimora's grandmother; (5) Isabel Kuhlman; and (6) Joseph Earle ("underlying plaintiffs").  Senior Home is the sole defendant in the underlying lawsuit which alleges that each underlying plaintiff was a tenant, resident, or invitee of the apartment building located at 24211 Denise, Clinton Township, Michigan, and that Senior Home supplied oxygen equipment to a resident of that apartment building, Paul Renwick. Underlying plaintiffs further allege that, as a result of a fire on November 25, 2005, "several tenants of the apartment complex and their invitees were needlessly trapped in the building, causing death, destruction, permanent injury and gross disfiguration, all due to" Senior Home's "negligence and breaches of duty."  (Doc. Entry No. 9, Pl.'s Ex. A, State Court Compl. ¶¶ 1-12, 14.)

Specifically, the underlying complaint alleges that Senior Home (1) owed a duty to the underlying plaintiffs "to protect individuals residing in the same building as Paul Renwick, Jr. from dangerous conditions or hazards posed by smoking near oxygen tanks and equipment;" (2) breached that duty by failing (a) to perform and/or repeat a safety risk assessment of the premises, (b) to provide and/or reinforce education to Paul Renwick

regarding causes of fire and fire prevention, (c) to assess and/or reassess Paul Renwick's level of comprehension and compliance, (d) to report Paul Renwick's noncompliance with safety rules to his physician, (e) to warn the other occupants of Renwick's apartment building of the foreseeable harm caused by his smoking while using oxygen, (f) to notify the fire department and/or law enforcement officials that Paul Renwick was smoking cigarettes while at the same time dispensing oxygen from his oxygen tank despite knowledge of same, (g) to notify apartment complex personnel or management that Paul Renwick was smoking cigarettes while at the same time dispensing oxygen from his oxygen tank despite knowledge of same, (h) to warn people in other apartments that Paul Renwick was smoking cigarettes while at the same time dispensing oxygen from his oxygen tank despite knowledge of same, and (i) other breaches of the duty of care that become apparent during discovery; and (3) each breach was a proximate cause of the underlying plaintiffs' injuries. (*Id.*)

### B. Oxygen Equipment

Senior Home had an oxygen service contract with Mr. Renwick, agreeing to deliver and service an oxygen concentrator and oxygen tanks for his use.  Senior Home, in turn, had an agreement to purchase oxygen equipment from Defendant Sunrise Medical from March 27, 2004 through March 31, 2006.  (Doc. Entry No. 31, Pl.'s Ex. B, Senior Home/Sunrise Medical Contract.)  Senior Home purchased oxygen concentrators, oxygen regulators, and oxygen aerosol canisters from Defendant Sunrise Medical.  (Doc. Entry No. 31, Pl.'s Exs. C-G.)

From June 20, 2000 to May 30, 2001, Senior Home purchased 2,481 oxygen aerosol canisters from Sunrise Medical.  These were shipped to Puritan Bennett, an agent of Senior

Home.  (Doc. Entry No. 36, Pl.'s Ex. G, invoices.)  These canisters were filled by Airgas, Inc. and distributed to Senior Home's clients.  Senior Home concedes that it received oxygen canisters from both Sunrise Medical and Airgas and cannot determine whether those supplied by Sunrise Medical as opposed to Airgas were present in Mr. Renwick's apartment at the time of the fire.

The oxygen tanks supplied to Mr. Renwick by Senior Home had conservers/regulators, manufactured by DeVilbiss, the manufacturing arm of Defendant Sunrise Medical. The conserver/regulator is designed to control the flow of oxygen.  It is a "conserving device" which senses negative pressure and only flows oxygen when a person breaths or inhales it. (Doc. Entry No. 32, Defs.' Ex. 8, Manzaroli Dep at 68-69, 30.) The device attaches on top of an oxygen tank and limits the amount of oxygen released and prevents a continuous flow of oxygen.  (Doc. Entry No. 32, Defs.' Ex. 14, Kennedy Aff. ¶¶ 2-4.)  At least one conserver serial number involved in the Renwick fire was recorded. On July 7, 2004, Sunrise Medical shipped an oxygen pulse conserver to Senior Home with the serial number 04F1D129651.  (Doc. Entry No. 31, Pl.'s Ex. D.)  On July 20, 2004, a Senior Home employee made a service call to Mr. Renwick and recorded delivering a new conserver with that same serial number.  (Doc. Entry No. 31, Pl.'s Ex. E.)

Mr. Renwick's apartment also contained an oxygen concentrator manufactured by Sunrise Medical and delivered by Senior Home.  "An oxygen concentrator is a separate device electrically operated that, when plugged into an electrical outlet, separates oxygen from room air which allows supplemental oxygen to be delivered to the patient's nasal cannula tubing."  (Doc. Entry No. 12, Olsavsky Aff. ¶ 5.)  "It does not store oxygen, and when turned off or unplugged does not retain residual oxygen." (*Id.*)  On January 12, 2004,

7

Sunrise Medical delivered a DeVilbiss brand oxygen concentrator, serial number H62779DS to Senior Home.  (Doc. Entry No. 31, Pl.'s Ex. F.)  That same oxygen concentrator was delivered to Mr. Renwick on June 29, 2004.  (Doc. Entry No. 31, Pl.'s Ex. G.)  On December 2, 2004 and March 30, 2005, a Senior Home employee serviced an oxygen concentrator at Mr. Renwick's apartment with that same serial number.  (Doc. Entry No. 31, Pl.'s Ex. H.)  The fire investigator's recovered "1 burnt oxygen concentrator" from Mr. Renwick's apartment after the fire.  (Doc. Entry No. 31, Pl.'s Ex. I.)

Although the fire investigator's report states that the oxygen concentrator was not plugged in at the time of the investigation, Mr. Renwick told fire investigators Conroy and Kuehn, immediately after being transported to the hospital, that he was breathing from his nasal cannula at the same time he was trying to light a cigarette when flames shot up, burned his face, and then caught the rug on fire.  He also told Conroy and Kuehn that, after he ran out of his apartment, fire shot across the hall and burned his back.  (*Compare* Doc. Entry No. 9, Pl.'s Ex. C, Conroy Report, *with* Doc. Entry No. 12, Defs.'s Ex. 2, 2/1/06 Investigative Suppl. Report.)

**C.  Noetic Insurance Policy**

Sunrise Medical had a "claims made" commercial general liability ("CGL") policy, No. N06CA380050, with Defendant Noetic Specialty Insurance with a policy period covering July 1, 2006 to July 1, 2007.  (Doc. No. 31, Pl.'s Ex. J, insurance policy.)  The following provisions are relevant to this litigation.

**1.  Vendors As Additional Insureds**

8

The policy contains an endorsement, No. CG 20 15 11 88, amending Section II of the insurance policy, titled "Who Is An Insured," and providing the "Schedule" referenced in the amended Section II.  The endorsement reads as follows:

**SCHEDULE**

**Name of Person or Organization Vendor):**  ALL VENDORS OF THE NAMED INSURED

**Your Products:**  ALL PRODUCTS OF THE NAMED INSURED

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN <u>INSURED</u> (Section II) <u>is amended to include as an insured any person or organization</u> (referred to below as vendor) <u>shown in the Schedule</u>, but only with respect to "bodily injury" or "property damage" arising out of <u>"your products"</u> <u>shown in the Schedule</u> which are distributed or sold in the regular course of the vendor's business. . . .

(*Id.* at Endorsement No. CG 20 15 11 88 (emphasis added).)[1]  Plaintiff Senior Home was a vendor of Sunrise Medical and thus included under the Noetic Special Insurance policy as an additional insured under the circumstances provided in this Endorsement.

### 2.  Duty to Defend and to Indemnify

The CGL insurance policy's insuring agreement provides a duty to defend and indemnify "bodily injury" caused by an "occurrence" that takes place in the "coverage territory" and a claim for damages because of the "bodily injury" is "first made against the insured, . . . , during the policy period  or any Extended Discovery Period we provide under EXTENDED DISCOVERY PERIODS (Section V)." (*Id.* at CGL Policy, Products/Completed

---

[1]The endorsement also sets out a number of exclusions that are not relevant here.  (Pl.'s Ex. L, insurance policy, Endorsement No. CG 20 15 11 88.)

9

Operations Liability (Claims-Made) Form No. CG 38 A 06 96 at p. 1.)  Specifically, the

policy provides that:

> 1.  Insuring Agreement
>
>     a.  We will pay those sums that the insured becomes legally obligated to
>         pay as damages because of "bodily injury" or "property damage"
>         included within the "products-completed operations hazard" to which
>         this insurance applies.  <u>We will have the right and duty to defend the
>         insured</u> against any "suit" seeking those damages.  <u>However, we will
>         have no duty to defend the insured against any "suit" seeking
>         damages for "bodily injury" or "property damage" to which this
>         insurance does not apply</u>.  We may, at our discretion, investigate any
>         "occurrence" and settle any claim or "suit" that may result. . . .

(*Id.* (emphasis added).)

The policy also contained a Duty to Defend Amendatory Endorsement, No. 351 04 02,

that deleted "item 1.a(2)" under "Section I - Coverages."  (*Id.* at Endorsement No. 351 04

02.)  The deleted section provided that the duty to defend did not begin until the self-

insured retention had been used up.  (*Id.*)  Accordingly, there is no self-insured retention

amount that must be satisfied before the duty to defend begins.

**3.  Definitions**

The following definitions are relevant to this insurance dispute:

First, preceding Section I, Coverages, the policy states:

> Throughout this policy the words "you" and "your" refer to the insured shown in
> the Declarations, <u>and any other person or organization qualifying as an insured
> under this policy</u>.

(*Id.* at CGL Policy, Products/Completed Operations Liability (Claims-Made) Form No. CG

38 A 06 96 at p. 1 (emphasis added).)

Next, under Section VI, Definitions, the policy provides that:

10

2.   "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * * * *

13.   "Products-completed operations hazard":

a. Includes all "bodily injury" . . . occurring away from premises you own or rent and <u>arising out of</u> "your product" or "your work" . . . .

17.   "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1)   You;

(2)   Others trading under your name; or

(3)   A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to fitness, quality, durability, performance or use of "your product"; and

b. <u>The providing of or failure to provide warnings or instructions</u>.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

(*Id.* at 8, 10, 11 (emphasis added).)

**D.  Notice of Claim, Denial of Defense, and Filing of This Action**

The underlying lawsuit was filed on April 5, 2007.   Based on the vendor's endorsement, Senior Home tendered the underlying lawsuit to Sunrise Medical and requested both defense and indemnity on May 2, 2007.  (Doc. No. 31, Pl.'s Ex. K, 5/2/07

11

letter.)  Sunrise Medical and Noetic Specialty Insurance denied Senior Home's requests. Senior Home then filed this action seeking a judgment declaring that it is an additional insured under Sunrise Medical's CGL policy with Noetic and is thus owed a defense and indemnification for the claims asserted in the underlying lawsuit.

### E.  Previous Opinion Finding Duty to Defend

On August 5, 2008, this Court issued an Order granting in part and denying in part Plaintiff's motion for summary judgment regarding the duties to defend and indemnify and denying Defendants' cross-motion.  (Doc. Entry No. 16, 8/5/08 Order.)  It held that Defendant Noetic Specialty Insurance owed Plaintiff a duty to defend in the underlying state court action because it "alleges that each of the underlying plaintiff's suffered 'bodily injury' as a result of Sunrise Medical's vendor's failure to provide adequate warnings or instructions in connection with a product manufactured, sold, handled or distributed by Sunrise Medical to its vendor, Senior Home." (*Id.* at 17.)  It denied Plaintiff's motion as to the amount of defense costs owed because Plaintiff had not presented the Court with supporting evidence as to the amounts sought.  (*Id.* at 18.)  Finally, it denied the parties' cross-motions for summary judgment on Noetic Specialty's duty to indemnify, finding that genuine issues of material fact remained for trial.  (*Id.*)

### F.  Subsequent Settlement and Appeal of Underlying State Court Action

The underlying state court action proceeded through a case evaluation hearing on July 7, 2008, resulting in the following case evaluation awards for the underlying plaintiffs: $35,000 for Tarien Hatcher; $75,000 for Markquita Frederick; $400,000 for the Estate of Kimora Hatcher (deceased daughter of Tarien Hatcher and Markquita Frederick); $75,000 for Yvette Hatcher (Kimora's grandmother); $5,000 for Isabel Kuhlman; and $5,000 for

12

Joseph Earle; for a total of $195,000.  (Doc. Entry No. 36, Pl.'s Ex. L, Case Evaluation Notice.)  After receiving notice of the case evaluation awards, Plaintiff advised Defendants of these amounts, that Plaintiff had 28 days to accept or reject, and requested Defendants' participation "in the consideration of and the instructions to [Plaintiff] as to the acceptance or rejection of the case evaluation award."  (Doc. Entry No. 31, Pl.'s Ex. L, 7/16/08 letter.)  On July 23, 2008, Defendants declined to participate in the settlement of the underlying state court action, asserting that there was no coverage owed Plaintiff under the Noetic Specialty insurance policy.  (*Id.*, Pl.'s Ex. M, 7/23/08 letter.)

Plaintiff was instructed by its insurance carrier, CNA Insurance Co., to accept all of the case evaluation awards except for the award for the Estate of Kimora Hatcher.  (*Id.* at 14; Doc. Entry No. 36, Pl.'s Ex. L, Case Evaluation with acceptances.)  Due to Plaintiff's acceptance, the underlying state court action has been settled in the above amounts as to all underlying plaintiffs except the Estate of Kimora Hatcher.

As to the Estate of Kimora Hatcher, Senior Home had filed a motion for summary disposition in the underlying state court action.  Relying on *Fultz v. Union-Commerce Associates*, 683 N.W.2d 587 (Mich. 2004), the state court granted Senior Home's motion, reasoning that the underlying plaintiffs' tort claims should be dismissed because Senior Home owed no duty to the underlying plaintiffs that was "separate and distinct" from the duties owed under its home delivery contract with Mr. Renwick.  (Doc. Entry No. 36, Pl.'s Ex. M, 11/14/08, Opinion and Order   denying underlying plaintiffs' motion for reconsideration of 9/19/08 opinion and order granting Senior Home's motion for summary disposition.)  That decision is currently on appeal to the Michigan Court of Appeals.  (Doc. Entry No. 31 at 14.)

13

The remaining facts will be addressed in the context of the various motions brought by Plaintiff and Defendants.

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

14

## A.  Plaintiff's Motion for Attorney Fees [24]

In response to this Court's order finding that Noetic Specialty owed it a duty to defend, Plaintiff's counsel wrote to Defendants' counsel on August 11, 2008, requesting reimbursement of defense costs incurred from the May 2, 2007 date of tender of the underlying state court action through June 20, 2008. (Doc. Entry No. 24, Pl.'s Ex. C, 5/2/07 tender letter.) The $29,016.96 amount requested reflected the discounted rate for attorney fees provided to Plaintiff's insurer, CNA Insurance Co.; 50% of defense costs; and no interest. (*Id.*, Pl.'s Ex. B, 8/11/08 letter.) No money was paid in response to this request.

On September 8, 2008, Plaintiff's counsel sent another letter to Defendants' counsel requesting the original $29,016.96 and an additional $2,559.74, reflecting attorney fees for the period of June 21, 2008 through August 22, 2008 and 50% of the printing costs from the file, for a total of $31,576.70. (*Id.*, Pl.'s Ex. D, 9/8/08 letter.) Defendants responded on October 10, 2008 with minor corrections to the total amount of defense costs claimed and enclosed a check "representing one half of [Plaintiff]'s *Hatcher* defense costs for the time between May 7, 2007 and August 22, 2008." (*Id.*, Pl.'s Ex. E, 10/10/08 letter.) Plaintiff has refused to cash Defendants' check.

### 1.  Attorney Fees as Damages for Breach of Duty to Defend

Because Defendants refused to pay the full amount Plaintiff requested, it filed one of the motions at issue here and now seeks attorney fees at a higher rate than those actually charged to CNA Insurance Co. in the underlying state court action, arguing that these higher fees are "reasonable" under prevailing Michigan law and thus recoverable. Defendants respond that attorney fees at a rate three times higher than those actually billed

15

by Plaintiff's counsel to Plaintiff's insurer, CNA Insurance Co., are a windfall; not reasonable attorney fees.  Defendants concede that "[t]he hourly rates actually charged to CNA are an acceptable reasonable rate."  (Resp. at 7, 11.)  A comparison of the fees is as follows:

| Plf. Attorney | Rate to CNA Ins. Co. | Rate Now Claimed "Reasonable" |
| --- | --- | --- |
| Peters | $130/hour | $450/hour |
| Henry | 120/hour | 300/hour |
| Pearce | 120/hour | 300/hour |
| Law Clerk | 65/hour | 100/hour |

(Doc. Entry No. 24, Pl.'s Ex. I, Pl.'s counsel's statements to CNA Ins. Co.)

This Court finds Defendants' argument persuasive.  Because Defendants breached the duty to defend, Plaintiff is entitled to contractual damages for that breach.  One element of damages consists of the attorney fees Plaintiff actually incurred in connection with the defense of the underlying action; provided those attorney fees are reasonable.  Plaintiff's reliance on *The Oscar W. Larson Co. v. United Capital Ins. Co.*, 845 F. Supp. 458, 462 (W.D. Mich. 1993), *aff'd*, 64 F.3d 1010 (6th Cir. 1995), for a contrary result is misplaced.  That court did not hold that it could ignore actual attorney fees incurred in the defense of the insured for higher fees.  Rather, it held that the actual attorney fees incurred were "reasonable," and thus recoverable as damages for the defendant insurance company's breach of its duty to defend.  Examining Michigan law for the distinction between a right to recover "actual" as opposed to "reasonable" attorney fees in this context, the court observed that:

> It appears that in Michigan an insured is entitled to recover reasonable attorney fees for an insurer's breach of its duty to defend its insured.  The Court is unwilling to extend the law to include actual attorney fees that may be unreasonable.

16

*Id.* From this, it is logical to conclude that Michigan law favors the award of actual attorney fees that are reasonable. Defendants concede that the actual attorney fees that Plaintiff's counsel charged for their defense of the underlying state court action are reasonable. Plaintiff provides no authority in support its position that the Court should ignore admittedly reasonable attorney fees that were actually charged and should instead consider the "reasonableness" of higher uncharged attorney fees. Accordingly, Plaintiff's arguments for higher, uncharged attorney fees is rejected. Plaintiff is entitled to recover the actual attorney fees charged to CNA Insurance Co. in connection with the defense of Plaintiff in the underlying state court action. This will serve to make Plaintiff whole for Defendants' breach of its duty to defend.[2]

### 2. An Award of Statutory Penalty Interest is Not Warranted

Michigan law provides for the award of 12% interest per annum if insurance benefits are not timely paid, unless the claim is reasonably in dispute. *See* Mich. Comp. Laws § 500.2006(1) and (4).[3] Plaintiff argues that it is entitled to this statutory penalty interest.

---

[2]At the hearing on these motions, held on August 5, 2009, Plaintiff's counsel agreed to submit current data regarding actual attorney fees and costs incurred in the defense of the underlying state court action.

[3]Mich. Comp. Laws Ann. § 500.2006(1) provides that:

> A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.

Defendants respond that the "unless" language applies to their no-duty-to-defend arguments. This Court finds Defendants' arguments persuasive. Plaintiff's duty to defend claim was reasonably in dispute until this Court issued its August 5, 2008 opinion; and after that date, the amount of defense costs owed to Plaintiff was reasonably in dispute. Section 500.2006(4) "is not intended to compensate a plaintiff for delay in recovering funds which are ultimately determined to rightfully belong to [plaintiff]. This is accomplished by the 6% judgment interest provision of Mich. Comp. L. 600.6013. Further, as a penalty Mich. Comp. L. § 500.2006(4) is to be strictly construed." *Bd. of Trs. of Mich. State Univ. v. Continental Cas. Co.*, 730 F. Supp. 1408, 1417 (W.D. Mich. 1990).

### 3. Additional Damages Owed for Breach of Duty to Defend

Although Plaintiff argues that it is entitled to the $195,000 paid to settle the bulk of the underlying state court action under Defendants' duty to indemnify, those settlement amounts are available to Plaintiff as damages for Defendants' breach of its duty to defend under the circumstances presented here.

### a. Settlement Amounts Owed as Damages for Breach of Duty to Defend

It is well-established that "[u]nder Michigan law, an insurer who breaches the duty to defend is bound 'by any reasonable settlement entered into in good faith between the insured and the third party.'" *Stryker Corp. v. XL Ins. Am. Inc.*, No. 4:01-CV-157, 2008 WL

_____

(emphasis added). Mich. Comp. Laws Ann. § 500.2006(4) provides, in pertinent part that:

> If benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at a rate of 12% per annum. . . .

68958, at *6 (W.D. Mich. Jan. 4, 2008) (quoting *Alyas v. Gillard*, 446 N.W.2d 610, 613

(Mich. Ct. App. 1989)).  As observed by the Michigan Supreme Court:

> If the insurer had an obligation to defend and failed to fulfill that obligation, then,
> like any other party who fails to perform its contractual obligation, it becomes
> liable for all foreseeable damages flowing from the breach. . . .An insurer's duty
> to defend is independent of its duty to pay, and damages for breach of that duty
> are not limited to the face amount of the policy.

*Capitol Reprod., Inc. v. Hartford Ins. Co*, 800 F.2d 617, 624 (6th Cir. 1986) (quoting

*Stockdale v. Jamison*, 330 N.W.2d 389, 392 (Mich. 1982).  "One basis for this rule seems

to lie in the law's reluctance to allow the insurer to benefit from the uncertainty created

when it renounces its duty."  *Capitol Reprod.*, 800 F.2d at 624.

### b. Settlement Amount

When presented with a claim that it does not believe is covered under its insurance

policy, an insurer has two options:  (1) it "may repudiate liability and refuse to defend, in

which case the insurer must accept the risk that its determination of no coverage was

incorrect;" or (2) "the insurer may protect itself by providing a defense under a reservation

of rights."  *Bristol West Ins. Co. v. Whitt*, 406 F. Supp.2d 771, 783 (W.D. Mich. 2005).  As

this Court previously determined, Defendant Noetic Specialty Insurance Co. breached its

duty to defend.  It must now accept the consequences of its incorrect conclusion that it

owed no such duty; i.e., reimburse Plaintiff for the $195,000 it paid to settle the bulk of the

claims asserted in the underlying lawsuit.

Moreover, Michigan law does not allow an insurer that has breached its duty to

defend, to sit idly by and then, after settlement, raise coverage arguments.  *See Alyas*, 466

N.W.2d at 613; *Ritzema v. Bailey Church of Christ*, No. 222344, 2001 WL 736570, *4

(Mich. Ct. App. Feb. 23, 2001); *Bristol West*, 406 F. Supp.2d at 783 (quoting *Alyas*, 446

19

N.W.2d at 613).  The Sixth Circuit, in *Capitol Reproductions*, set out the general rule under

Michigan law and then observed that it applies to settlements.

> [A]n insured is not "required to prove that the amount of the judgment in excess
> of the policy limits was caused by the failure of the insurer to provide a
> reasonable defense, since if the insurer *had* provided a reasonable defense as
> required by its contract, there would be no need for anyone to attempt to offer
> proofs on that illusive subject." *Maynard v. Sauseda*, 121 Mich. App. 644, 329
> N.W.2d 774, 779 (1982).  This general rule applies as well to settlements.

800 F.3d at 624 (citing *Detroit Edison v. Mich. Mut. Ins. Co.*, 102 Mich. App. 136, 144, 301

N.W.2d 832 (1980)).

Accordingly, Defendants cannot argue that the settlement did not flow from a breach

of its duty to defend.  Likewise, Defendants cannot now litigate whether it owed a duty to

indemnify the settled claims.   As the Sixth Circuit recently observed, the time to raise

substantive coverage arguments is during settlement negotiations; "not in litigation after the

fact."  *Sterling Heights v. United Nat'l Ins. Co.*, 319 F. App'x 357, 362 (6th Cir. 2009).  Here,

Defendants refused to provide a defense or to take part in accepting or rejecting the case

evaluation awards despite Plaintiff's request to do so, and the underlying action was

subsequently settled as to all underlying plaintiffs except for the Estate of Kimora Hatcher.

As observed in *Alyas*, Defendants were "given the opportunity to exert whatever rights

[they] had under [the] policy before the settlement was entered.  [They] declined to exercise

those rights."  *Alyas*, 446 N.W.2d at 613. Because Defendant Noetic Specialty Insurance

Co. breached "its own policy of insurance by refusing to fulfill its duty to defend the insured,

the insurer is bound by any reasonable settlement entered into in good faith between the

insured and the third party."  *Id.*  Defendants do not contest Plaintiff's evidence showing

that the settlement was both reasonable and the product of good faith.   Accordingly,

20

Defendants are liable to Plaintiff for the $195,000 paid to settle the underlying state law claims as damages for Noetic Specialty Insurance Co.'s breach of its contractual duty to defend.

### 4.  SIR Retention of $1 Million Does Not Apply to Defense Costs

Defendants argue that its obligation to Plaintiff for defense costs is not triggered until Plaintiff's self-insured retention of $1 million has been used up.  (Doc. Entry No. 32 at 2; Doc. Entry No. 33 at 16, n.3.)  Defendants are mistaken.  Their argument ignores that the Noetic Specialty insurance policy has a Duty to Defend Amendatory Endorsement, No. 351 04 02, that deleted "item 1.a(2)" under the policy's "Section 1 - Coverages."  Deleted item 1.a(2) under the coverages section provided that:

> Our right and duty to defend does not begin until the applicable limit of your self-insured retention has been used up in the loss reserves and payment of judgments, settlements and defense expense; . . . .

(Doc. Entry No. 31, Pl.'s Ex. J, CG 38 A 06 96 at 1.)

Having fully addressed the parties' duty to defend arguments, the Court now turns its attention to their duty to indemnify arguments.


### B.  Cross-Motions for Summary Judgment Regarding Indemnification [31, 32]

Defendants raise two arguments for their position that there is no duty to indemnify under the Noetic Specialty insurance policy.  Defendants first argue that, under the plain language of the policy, Plaintiff cannot be considered an insured and that Plaintiff's failure to warn or give instructions regarding Defendant Sunrise Medical's products does not fall within the policy's definition of "your product."  Defendants also argue that there is no duty

to indemnify because Plaintiff has not presented any evidence of a causal connection to the fire that would satisfy the policy's "arising out of" language.  Plaintiff argues the opposite.  The Court addresses each argument in turn.

### 1.  Defendants' Policy Language Arguments

#### a.  Definition of "You" and "Your"

Defendants argue that the terms "you" and "your" have been defined in the Noetic Specialty insurance policy to mean only the named insured – Sunrise Medical.  From that premise, Defendants then assert that the policy's definition of "your products" cannot be read to include allegations that Plaintiff failed to adequately warn or provide instructions with regard to one of Sunrise Medical's products.  (Doc. Entry No. 32 at 18-19.)  The premise of Defendants' argument ignores the policy's plain language which provides otherwise:

> Throughout this policy the words "you" and "your" refer to the insured shown in the Declarations, <u>and any other person or organization qualifying as an insured under this policy</u>.

(Doc. Entry No. 31, Pl.'s Ex. J, CG 38 A 06 96 at 1 (emphasis added).)  Michigan law does not permit the courts to ignore an insurance policy's plain language in favor of a technical or strained construction.  *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989).    Accordingly, the construction of "you," "your," and "your products" that Defendants advance is properly rejected.

#### b.  Policy Endorsement Adding Vendors as Insureds

Defendants also attempt to limit the policy's definition of "your products" by referencing a policy endorsement that adds vendors as additional insureds.  Endorsement No. CG 20

15 11 88 amends Section II of the insurance policy which is titled "Who Is An Insured," and

provides the Schedule referenced in that amended Section.  The endorsement reads as

follows:

**SCHEDULE**

**Name of Person or Organization Vendor):**  ALL VENDORS OF THE NAMED
INSURED

**Your Products:**  ALL PRODUCTS OF THE NAMED INSURED

(If no entry appears above, information required to complete this endorsement
will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN <u>INSURED</u> (Section II) <u>is amended to include as an insured any
person or organization</u> (referred to below as vendor) <u>shown in the Schedule</u>, but
only with respect to "bodily injury" or "property damage" arising out of <u>"your
products" shown in the Schedule</u> which are distributed or sold in the regular
course of the vendor's business. . . .

(*Id.* at Endorsement No. CG 20 15 11 88 (emphasis added).)[4]   Referencing the Schedule

set out in the Endorsement, because Plaintiff Senior Home was a vendor of Sunrise

Medical, it is included under the Noetic Special Insurance policy as an additional insured

under the circumstances provided in this Endorsement.  Those circumstances require that

Plaintiff show that the underlying suit concerns "bodily injury . . . arising out of" any of

Sunrise Medical's products.  Contrary to Defendants' arguments here, this Endorsement

does not otherwise limit the policy's definition of "your product" which includes "[t]he

providing of or failure to provide warnings or instructions."  (Doc. Entry No. 31, Pl.'s Ex. J,

CGL policy at § VI - Definitions, ¶ 17.)   Accordingly, it does not preclude coverage for

lawsuits alleging that Senior Home failed to provide warnings or instructions about the

---

[4]The endorsement also sets out a number of exclusions that are not relevant here.  (Pl.'s
Ex. L, insurance policy, Endorsement No. CG 20 15 11 88.)

proper use of a Sunrise Medical product that it distributed.  To trigger the duty to indemnify, however, Plaintiff must still show that the alleged bodily injuries "arose out of" a Sunrise Medical product.

### c. "Arising Out Of" Policy Language

The Sixth Circuit, applying Michigan insurance law, has interpreted the phrase "arising out of" as being "'ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to or having a connection with.'" *Kmart Corp. v. Fireman's Fund Ins. Co.*, 88 F. Supp.2d 767, 773 (E.D. Mich. 2000) (quoting *Assurance Co. of Am. v. J. P. Structures, Inc.*, No. 95-2384, 96-1010, 96-1027, 1997 WL 764498, *5 (6th Cir. Dec. 3, 1997)).  As this Court previously noted, the Michigan Court of Appeals has recently observed that, although "[t]he phrase 'arising out of' has been defined in different contexts," it has generally been construed to "require[] a causal connection." *Empire Fire & Marine Ins. Co. v. Minuteman Int'l, Inc.*, No. 274660, 2008 WL 142424, *2 (Mich. Ct. App. Jan. 15, 2008) (citing cases).  Defendants do not argue otherwise.  Rather, they argue that, because Plaintiff has not presented any admissible evidence to support its claim that bodily injuries to the underlying plaintiffs "arose out of" or had a causal nexus with a Sunrise Medical product, there is no duty to indemnify and thus the duty to defend not longer exists.  The Court now addresses this argument.

### 2. Factual Arguments Regarding Indemnification and "Arising Out Of" Policy Language

The only claim left to indemnify is that involving the underlying plaintiff Estate of Kimora Hatcher.  In the underlying state action, the court granted Senior Home's motion for summary disposition, dismissing the Estate's tort claims against Senior Home.  Relying

on *Fultz v. Union-Commerce Associates*, 683 N.W.2d 587 (Mich. 2004), the court reasoned that Senior Home owed no duty to the underlying plaintiffs that was "separate and distinct" from the contractual duties owed under its home delivery contract with Mr. Renwick. (Doc. Entry No. 36, Pl.'s Ex. M.) That decision is currently on appeal to the Michigan Court of Appeals.

Defendants first argue here that there can be no duty to indemnify because the state court has already determined that Senior Home owes no duty under tort law to the underlying plaintiffs. Absent any such duty, Defendants' conclude, Plaintiff cannot establish any causal connection between a Sunrise Medical product and the underlying plaintiffs' injuries. Defendants' argument ignores that this issue is currently pending on appeal before the Michigan Court of Appeals. In light of a recent Sixth Circuit decision adopting a less expansive view of *Fultz*, Defendants argument is rejected as premature. *See Davis v. Venture One Const., Inc.*, 568 F.3d 570 (6th Cir. 2009).

Defendants next argue that, "just because an unplugged concentrator and regulator/conserver" manufactured by Defendant Sunrise Medical's manufacturing arm "were inside Renwick's apartment," that is not enough to establish that the underlying plaintiffs' bodily injuries arose out of these products. (Doc. Entry No. 33 at 14.) This evidence, Defendants contend, impermissibly relies upon layer upon layer of speculation to establish the required causal connection between the underlying plaintiffs' injuries and a Sunrise Medical product. *See Skinner v. Square D Co.*, 516 N.W.2d 475, 484 (Mich. 1994) (observing that "[c]ausation theories that are mere possibilities or, at most, equally as probable as other theories do not justify denying defendant's motion for summary judgment."). Defendants emphasize that (1) there is no evidence that Sunrise Medical's

25

concentrator was plugged in at the time of the fire or had anything to do with it; (2) there is no evidence that any of the oxygen tanks found in his apartment belonged to Sunrise Medical; and (3) there is no evidence that the Sunrise Medical conserver/regulator found in Renwick's apartment had anything to do with the fire.  Rather, Defendants argue, a review of the evidence presented shows that the underlying plaintiffs' injuries arose out of a fire started by Mr. Renwick's careless smoking and accelerated because of oxygen that came from Airgas.

Contrary to Defendants' arguments above, Plaintiff has presented evidence showing more than the mere presence of Defendant Sunrise Medical's products in Mr. Renwick's apartment at the time of the fire.  This Court previously determined that the underlying state court action alleged injuries from a fire that was either started by Mr. Renwick's improper smoking around oxygen equipment or accelerated by the presence of oxygen equipment in his apartment.  It also alleged that the underlying plaintiffs were injured because Plaintiff Senior Home failed to adequately provide warnings about the use of this oxygen equipment.  Stated in the language of the Noetic Specialty insurance policy, Plaintiff now asserts that it entitled to indemnification because it has shown that it is an additional insured under that policy because it is alleged that the underlying plaintiffs' bodily injury arose out of Senior Home's failure to provide adequate warnings about Mr. Renwick's use of oxygen equipment manufactured by Sunrise Medical.  In support, Plaintiff presents evidence that at least two Sunrise Medical products were present in Mr. Renwick's apartment at the time of the fire: (1) at least one oxygen tank with a regulator/conserver manufactured by DeVilbiss, the manufacturing arm of Defendant Sunrise Medical, and (2) an oxygen concentrator, also manufactured by DeVilbiss, the manufacturing arm of

26

Defendant Sunrise Medical.  Both were delivered by Defendant Sunrise Medical's vendor, Plaintiff Senior Home.  (Doc. Entry No. 31, Pl.'s Exs. D-I.)  Plaintiff also presents evidence that the oxygen tanks located in Mr. Renwick's apartment were sold to Plaintiff Senior Home by either Defendant Sunrise Medical or non-defendant Airgas.  (Doc. Entry No. 31, Pl.'s Ex. C, Sunrise Medical Oxygen Tank Invoices.)  More importantly, Plaintiff presents testimony from Mr. Renwick's criminal trial that Renwick was breathing from a nasal cannula or tubing and inhaling oxygen with the assistance of oxygen equipment at the time of the fire.  (Doc. Entry No. 36, Pl.'s Ex. B, Fire Investigator Conroy's Testimony, 9/26/06 Crim. Trial Tr. at 26.)  That nasal cannula would have been connected to either a concentrator or a regulator/conserver on top of an oxygen tank.

Fire Inspector Willis testified at Mr. Renwick's criminal trial that Renwick fell asleep while smoking and wearing the nasal cannula and inhaling oxygen:

> [M]y opinion is that he was sitting in his chair smoking.  He had fallen asleep wearing the cannula cause [sic] oxygen, receiving his oxygen at which point when it is dropped, the cigarette, it started to ignite the couch.  He was awakened because he had started to get burned from the fire and that's what woke him up.  He in turn then stood up into the fire into the hot gassy layer which caused the injuries to his face which would have been, he had some singed nose hair and what not and then he exited the apartment.
>
> * * *
>
> What would have happened was the couch would have started on fire, the apartment would then start, it would have started to produce a heat layer.  As it came down it would have been in turn the oxygen tanks would have started to become heated.  There's a pressure release value on the oxygen tanks that should release when the pressure inside the tanks becomes approximately thirty hundred, thirty-three hundred and sixty pounds per square inch.  These particular tanks are filled to two thousand pounds per square inch.  So as the fire did progress, there was a, a sudden rapid release of oxygen and at least one of the tanks exploded.

(Doc. Entry No. 32, Defs.' Ex. 12, Fire Inspector Willis' 9/26/06 Crim. Trial Tr. at 8-9.) Plaintiff also claims that it provided Renwick with warnings and instructions about the proper use and safety of Sunrise Medical's products.  (Doc. Entry No. 36 at 8.)

Considering the evidence and arguments presented by Plaintiff and Defendants, this Court finds that questions of fact remain for trial on the issue of Noetic Specialty's duty to indemnify.  Accordingly, the parties' cross-motions for summary judgment on this issue are denied.

## IV.   Conclusion

For the above-stated reasons, Plaintiff's motion regarding defense costs is GRANTED IN PART and DENIED IN PART, and the parties' cross-motions for summary judgment regarding indemnification are DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 7, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 7, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager